## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [FILED UNDER SEAL], | **FILED UNDER SEAL** |
| Plaintiffs-Relators, | **DO NOT PLACE ON PACER** |
| v. | **CIVIL ACTION NO.:** |
| [FILED UNDER SEAL], | **JURY TRIAL DEMANDED** |
| Defendants. | |

## RELATOR'S COMPLAINT UNDER THE FALSE CLAIMS ACT

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DEFENSE PRODUCTION SOLUTIONS, INC. and GARY FLYNN,<br><br>                 Plaintiffs-Relators,<br><br>      v.<br><br>POLARIS INDUSTRIES, INC. and POLARIS SALES, INC.<br><br>              Defendants. | **FILED UNDER SEAL**<br><br>**DO NOT PLACE ON PACER**<br><br>**CIVIL ACTION NO.:**<br><br>**JURY TRIAL DEMANDED** |

## RELATOR'S COMPLAINT UNDER THE FALSE CLAIMS ACT

**TABLE OF CONTENTS**

I.  SUMMARY OF THE CASE ................................................................................................. 1

II.  THE PARTIES ............................................................................................................. 2

    A.    Government Plaintiff ...................................................................................... 2

    B.    Relators ........................................................................................................ 3

    C.    Defendants ................................................................................................... 4

III.  JURISDICTION AND VENUE ............................................................................... 4

IV.  THE LAW .................................................................................................................. 5

    A.    The False Claims Act .................................................................................. 5

    B.    Fraud in the Inducement Theory of False Claims Act Liability ..................... 6

V.  BACKGROUND ......................................................................................................... 7

    A.    Small Business Participation in Army Contracts .......................................... 7

    B.    Army's Issuance of RFP W56HZV-11-R-G210 ......................................... 9

VI. POLARIS'S FRAUD ................................................................................................. 9

    A.    Polaris Submits a Bid for a Highly Inflated Small Business Participation Percentage. .. 9

    B.    Polaris's Proposed Small Business Participation Rate of 44.9% was a Practical Impossibility and an Attempt to Induce Army Contacting Command to Award the Contract. ........................................................................................................... 11

VII. POLARIS'S LIABILITY UNDER THE FALSE CLAIMS ACT ................................... 13

    A.    Polaris Fraudulently Induced Army Contracting Command to Award the Contract. ..... 13

    B.    Polaris Presented False Claims by Submitting Invoices for Payment. .......................... 13

    C.    Polaris's Misrepresentations Were Material to the Award of the Contract and to the Army's Continued Payments Under the Contract. ....................................................... 13

VIII. COUNTS ................................................................................................................... 14

PRAYER FOR RELIEF .................................................................................................... 15

Plaintiffs-Relators Defense Production Solutions, Inc. and Gary Flynn (collectively, "Relators") on behalf of the United States of America, bring this action against Defendants Polaris Industries, Inc. and Polaris Sales, Inc. (collectively, "Polaris") for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, et seq., to recover all damages, civil penalties, and all other recoveries provided for under the FCA.

## I.     SUMMARY OF THE CASE

1.      In 2011, the United States Army solicited bids for a contract to manufacture all-terrain vehicles ("ATV"s) and related parts in connection with its ongoing operations in Iraq and Afghanistan.  As required by military procurement regulations, the Army made clear that one of the factors it would consider in reviewing bids was the extent to which a bidder anticipated subcontracting services to small businesses.   This is part of the Government's overall goal to increase the utilization of small businesses with respect to Government contracting.

2.      Polaris is one of the country's largest manufacturers of ATVs with annual sales of $4.5 billion.  Polaris submitted a bid for the Army contract, and in its bid, represented to the Army that 44.9% of the services it subcontracted under the contract would be subcontracted to small businesses.  Unfortunately, Polaris was incapable (and knew it was incapable) of achieving such a high small business participation rate.  Rather, with its knowledge that small business participation was one of the factors the Army would consider in awarding a bid, Polaris substantially misrepresented its anticipated small business participation rate. The Army, relying on this misrepresentation, awarded the contract to Polaris for $54 million.

3.      Put differently, Polaris subverted the laudable purpose of the Army's consideration of small business participation by engaging is misrepresentations to induce the Army to award the contract to a multi-billion dollar company.

4.      The FCA prohibits the presentation of false claims. 31 U.S.C. §§ 3729.  Under a fraudulent inducement theory of FCA liability, a contractor who makes false or fraudulent misrepresentations material to the award of a Government contract is liable under the FCA for presenting false claims when it subsequently requests payment under the fraudulently-obtained contract.  Because Polaris fraudulently induced the Army to award it a $54 million contract, each and every invoice presented by Polaris to the Army for payment constitutes a false claim for which Polaris is liable under the FCA.

5.      Independently, once the contract was awarded to Polaris, the company made false certifications in its invoices to the government, thereby submitting claims that were independently false.

## II.    **THE PARTIES**

### A.    **The Government**

6.      The United States is a plaintiff to this action on behalf of the United States Department of Defense, the United States Army, the United States Army Materiel Command, and the United States Army Contracting Command ("Army Contracting Command").

7.      Army Contracting Command is an entity within the United States Army headquartered in Redstone Arsenal near Huntsville, Alabama that is responsible for procuring the equipment and services necessary to enable the United States Army to complete its mission.

8.      Army Contracting Command is a subordinate entity to the United States Army Materiel Command.

9.      The United States Army Materiel Command is a command within the United States Army headquartered in Redstone Arsenal near Huntsville, Alabama and is primarily responsible for providing the materiel necessary for the United States Army to complete its mission.

10.    The United States Army is a component of the United States Department of Defense.

**B.    Relators**

11.    Relator Defense Production Solutions, Inc. ("DPS") is a corporation incorporated in Nevada with its principal place of business in Las Vegas, Nevada.

12.    DPS is in the business of manufacturing products for defense contracts, including contracts with entities within the Department of Defense and the North Atlantic Treaty Organization (NATO).

13.    DPS manufactures an array of military vehicles, supplies, and systems, including armored vehicles.

14.    Relator Gary Flynn was employed by Arctic CAT, Inc. ("Arctic CAT") for over 10 years as a sales manager.

15.    Arctic CAT is a corporation incorporated in Minnesota with its principal place of business in Minneapolis, Minnesota.

16.    Arctic CAT manufactures adventure vehicles, sometimes known as Powersports vehicles, including ATVs, snow mobiles, and motorcycles.

17.    Arctic CAT is a competitor of Polaris with respect to the manufacture of Powersports vehicles.

18.    Relator Flynn recently retired from Arctic CAT.

19.    As described extensively herein, in his capacity as a sales manager for Arctic CAT, Relator Flynn is intimately familiar with manufacturing process for Powersports vehicles, and Defendant Polaris's manufacturing process.

### C.    Defendants

20.    Defendant Polaris Industries, Inc. is a corporation incorporated in Delaware with a principal place of business in Medina, Minnesota.

21.    Defendant Polaris Sales, Inc. is a corporation incorporated in Delaware with a principal place of business in Medina, Minnesota.

22.    Defendant Polaris Sales, Inc. is a wholly-owned subsidiary of Defendant Polaris Industries, Inc.

23.    Defendant Polaris Industries, Inc. and Defendant Polaris Sales, Inc. are jointly referred to as "Polaris" in this Complaint unless otherwise specified.

24.    Polaris is in the business of manufacturing as Powersports vehicles, including ATVs, snow mobiles, and motorcycles.

25.    Polaris conducts business across the United States and around the world.

26.    Apart from its production of recreational vehicles, Polaris also has substantial operations with respect to the production of military and government vehicles under the tradename "Polaris Government & Defense," which was previously known as "Polaris Defense."

### III.    <u>JURISDICTION AND VENUE</u>

27.    Jurisdiction is founded under 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331, 1345.

28.    Personal jurisdiction and venue are proper in the District of Minnesota pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because at least one of the Defendants transacts and has transacted business in the District of Minnesota.

IV.    **THE LAW**

A.    **The False Claims Act**

29.    The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

30.    The FCA "establishes a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," U.S. ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1995 (2016).

31.    The FCA provides, *inter alia,* that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

32.    The terms "knowing" and "knowingly" mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

33.    Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

34.    The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the

5

Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

35.      "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

36.      Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

37.      Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 and 81 Fed. Reg. 42491 (2016), the civil monetary penalties under the FCA were adjusted to $10,781 to $21,563 for violations occurring on or after November 2, 2015. See 28 C.F.R. § 85.5.

**B.      Fraud in the Inducement Theory of False Claims Act Liability**

38.      Courts have repeatedly held that liability for fraud in the inducement is established when eligibility to receive funds under a government program was procured by lies or other misleading actions. United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494 (8th Cir. 2016); United States v. R.J. Zavoral & Sons, Inc., 2014 WL 5361991, at *9 (D. Minn. Oct. 21, 2014) ("Under the FCA, liability will attach to any 'claim submitted to the government under a contract so long as the original contract was obtained through false statement or fraudulent conduct.'") (citing In re: Baycol Prods. Litig., 732 F3d 869, 876 (8th Cir. 2013)).

39.      In fraud in the inducement FCA cases, liability attaches "to each claim submitted to the government under a contract, when the . . . extension of government benefit was originally

6

obtained through false statements or fraudulent conduct." <u>United States ex rel. Hendow v. University of Phoenix</u>, 461 F.3d 1166, 1173 (9th Cir. 2006).

40.    Moreover, "[u]nder this theory 'claims for payment subsequently submitted under a contract initially induced by fraud do not have to be false or fraudulent in and of themselves in order to state a cause of action under the FCA.'" <u>R.J. Zavoral</u>, 2014 WL 5361991, at *9 (citing <u>Baycol Prods. Litig.</u>, 732 F3d at 876).

## V.    BACKGROUND

### A.    Small Business Participation in Army Contracts

41.    The Defense Procurement and Acquisition Policy ("DPAP") is an entity within the Department of Defense responsible for procurement activities involving entities within the Department of Defense, including Army Contracting Command.

42.    DPAP issues Defense Federal Acquisition Regulation Supplement ("DFARS"), which are regulations that govern the procurement process and Procedures, Guidance, and Information ("PGI"), which provide guidance with respect to DFARS regulations.

43.    DFARS regulations provide that "the extent of participation of small businesses to include service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns in 0erformance of the contract ***shall be addressed in source selection***." DFARS § 215.304(c)(1) (emphasis added).

44.    Moreover, "[t]he contracting officer shall evaluate the extent to which offerors identify and commit to small business performance of the contract, whether as a joint venture, teaming arrangement, or subcontractor." <u>Id</u>.

45.     The DFARS regulations also refer to PGI § 215.304(c)(i)(A) for "examples of evaluation factors" with respect to evaluating small business participation. Id. at § 215.304(c)(1)(A).

46.     PGI § 215.304(c)(i)(A) provides:

Evaluation factors may include—

*(1)* The extent to which such firms are specifically identified in proposals;
*(2)* The extent of commitment to use such firms (for example, enforceable commitments are to be weighted more heavily than non-enforceable ones);
*(3)* The complexity and variety of the work small firms are to perform;
***(4) The realism of the proposal;***
*(5)* Past performance of the offerors in complying . . .
(6) The extent of participation of such firms in terms of the value of the total acquisition.

Id. (emphasis added).

47.     Likewise, the Department of Defense's Source Selection Procedures provides that where required by law, an entity reviewing bids for a defense contract "shall evaluate the extent of participation of small business concerns."[1]

48.     In sum, both DFARS regulations, PGI guidance, and other guidance require Army Contracting Command to evaluate small business participation in reviewing bids for defense contracts.

49.     These regulations and guidance utilize the term "small business concerns," a term defined by regulations adopted by the Small Business Administration ("SBA"). See 13 C.F.R. § 121.101 ("SBA's size standards define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns").

---

[1] DEPARTMENT OF DEFENSE, Source Selection Procedures, at § 2.3.4.2.3 (Mar. 31, 2016), available at http://www.acq.osd.mil/dpap/policy/policyvault/USA004370-14-DPAP.pdf.

### B.    Army's Issuance of RFP W56HZV-11-R-G210

50.    On June 17, 2011, Army Contracting Command issued Request for Proposal ("RFP") W56HZV-11-R-G210 for "the Afghanistan Iraq Supplemental Acquisition Program (AISAP) acquisition of All Terrain Vehicles (ATVs), ATV Trailers, and Spare parts."

51.    The purpose of RFP W56HZV-11-R-G210 was to solicit bids for the Army to acquire ATVs and related parts for use with respect to the Army's ongoing operations in Iraq and Afghanistan.

52.    RFP W56HZV-11-R-G210 provided that bids would be assessed based on an evaluation of four factors: (1) technical factors concerning the ability to comply with the Army's needs specified in the RFP, (2) delivery factors concerning the ability to timely deliver the equipment ordered, (3) small business participation, and (4) price.

53.    As described in a later memorandum from Army Contracting Command evaluating the bids received for RFP W56HZV-11-R-G210, "Small Business Participation Evaluation will assess the extent to which the proposal identifies participation by U.S. small business concerns to achieve the Government goals listed for Small Business (SB) and Small Disadvantaged Business (SDB) subcontracting."

54.    RFP W56HZV-11-R-G210 set a goal of 31.7% for small business participation, which means that 31.7% of the subcontracted services under the resulting contract would be awarded to qualified small business concerns.

## VI.    POLARIS'S FRAUD

### A.    Polaris Submits a Bid for a Highly Inflated Small Business Participation Percentage.

55.    Seven entities submitted bids for RFP W56HZV-11-R-G210, including DPS and Polaris.

9

56.    DPS's proposal included an evaluated price of $53.4 million and a small business participation rate of 8.3%.

57.    Polaris's bid included an evaluated price of $59.4 million and a small business participation rate of 44.9%.

58.    Specifically, Polaris proposed to allocate $12.3 million of the $27.4 million subcontract dollars to qualified small business concerns.

59.    In its bid, Polaris included the names of the small business subcontractors, description of the supplies or services that would be purchased from the small business subcontractors, and the dollar amounts of such purchases.

60.    As described below, Polaris' proposed small business participation rate of 44.9% was a practical impossibility.

61.    In or around August 2011, Army Contracting Command issued a Source Selection Decision ("SSD") Memorandum, which substantively evaluated the various bids received in connection with RFP W56HZV-11-R-G210.

62.    The SSD memorandum concluded that "the proposal of Polaris Sales, Inc. represents the best overall value and is the most advantageous to the Government for meeting the requirements and objectives reflected in RFP W56HZV-11-R-G210."

63.    The SSD memorandum makes clear that Army Contracting Command considered the bidder's proposed small business participation rates.

64.    Polaris' proposed small business participation rate of 44.9% was described as "excellent."

65.    The SSD memorandum noted that Polaris' proposed small business participation rate of 44.9% "exceed the RFP goal[] of 31.7%."

10

66.     The SSD memorandum further noted that Polaris' "small business lists, which provide names of suppliers, description of supplies or services, and dollar amounts, support the assigned Very Low risk ratings the offeror will not achieved its proposed SB [small business] percentages."

67.     The SSD memorandum concluded that "[i]n comparing the proposals at the Small Business Participation factor level, the proposals from Polaris [and another offeror] are more advantageous than the proposals from the rest of the offerors because the proposals from Polaris [and the other offeror] provide participation in excess of the" small business participation goals included in RFP W56HZV-11-R-G210.

68.     DPS's proposed small business participation rate of 8.3% was described as "marginal."

69.     In or around September 2011, Army Contracting Command awarded the contract to Polaris.

**B.     Polaris's Proposed Small Business Participation Rate of 44.9% was a Practical Impossibility and an Attempt to Induce Army Contacting Command to Award the Contract.**

70.     As described above, Relator Flynn worked as a sales manager for Arctic CAT, a competitor of Polaris with respect to the manufacture of ATVs, for ten years.

71.     In the capacity, Relator Flynn is intimately familiar with the manufacturing and sales processes for ATVs.

72.     Given that Arctic CAT and Polaris are competitors, Relator Flynn is specifically familiar with Polaris's manufacturing and sales processes for ATVs.

73.     During Relator Flynn's time working at Arctic CAT, Arctic CAT and Polaris utilized many of the same subcontractors and suppliers in the ATV manufacturing process.

74.    Relator Flynn knows that Polaris employs a "vertical manufacturing model," under which it largely manufactures ATVs in house, *i.e.* without the use of subcontractors and third-parties.

75.    Specifically, Polaris manufactures its own engines for ATVs utilizing a Polaris-owned facility in Mexico.  Polaris then performs the frame and coach work for ATVs at its facility in Minnesota.

76.    Relator Flynn knows that Polaris only subcontracts a very small amount of its work to third-parties with respect to the manufacture of ATVs.

77.    Moreover, Relator Flynn knows that even with respect to the very small percentage of work that Polaris subcontracts, that work is subcontracted to small business concerns.

78.    Based on his longstanding experience at Arctic CAT and his familiarity with Polaris's manufacturing process, Relator Flynn knows that it would be practically impossible for Polaris to develop a subcontractor base capable of performing 44.9% of the contract in the delivery time allotted under the contract, not to mention subsidizing the necessary startup costs associated with finding and grooming a roster of small businesses capable of ensuring timely delivery and adequate quality performance.

79.    Upon information and belief, at the time it submitted its bid for RFP W56HZV-11-R-G210, Polaris did not intend to subcontract 44.9% of the subcontracted work to small business concerns within the meaning of 13 C.F.R. § 121.101 et seq. if it was awarded the contract.

80.    Upon information and belief, at the time it submitted its bid for RFP W56HZV-11-R-G210, Polaris could not have feasibly subcontracted 44.9% of the subcontracted work to small business concerns within the meaning of 13 C.F.R. § 121.101 et seq. if it was awarded the contract.

VII.    **POLARIS'S LIABILITY UNDER THE FALSE CLAIMS ACT**

A.    **Polaris Fraudulently Induced Army Contracting Command to Award the Contract.**

81.    Polaris fraudulently induced Army Contracting Command to award the contract by misrepresenting its actual intentions with respect to the small business participation rate.

82.    Given both the general regulations and guidance governing military procurement and the specific disclosures in RFP W56HZV-11-R-G210, Polaris knew that small business participation would be an important component of Army Contracting Command's award of RFP W56HZV-11-R-G210.

83.    For the reasons explained above, Polaris's proposed small business participation rate of 44.9% included in its bids for RFP W56HZV-11-R-G210 was a practical impossibility and Polaris could not have actually accomplished a 44.9% small business participation rate.

B.    **Polaris Presented False Claims by Submitting Invoices for Payment.**

84.    Following award of the contract in or around September 2011, Polaris regularly submitted invoices to Army Contracting Command for payment.

85.    In doing so, Polaris falsely certified that it was satisfying its small business participation requirements.

C.    **Polaris's Misrepresentations Were Material to the Award of the Contract and to the Army's Continued Payments Under the Contract.**

86.    As described above, within the meaning of the FCA, "[t]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

87.    Army Contracting Command is required to, and does, substantively consider the small business participation. DFARS § 215.304(c)(1); PGI § 215.304(c)(i)(A).

88.    RFP W56HZV-11-R-G210 makes clear that small business participation is one of the four factors under which bids would be evaluated.

89.    Likewise, the SSD memorandum makes clear that Army Contracting Command substantively considered Polaris's 'excellent" proposed small business participation rate of 44.9% in selecting Polaris as the contractor for RFP W56HZV-11-R-G210.

90.    Finally, the failure to comply in good faith with small business participation requirements is, as a matter of law by operation of statute and regulation, a material breach of contract. See 15 U.S.C. § 637(d)(8)-(9); 48 C.F.R. § 19.702(c).

91.    Army Contracting Command would not have awarded the contract to Polaris had it known that Polaris had misrepresentation its anticipated small business participation rate because (1) Polaris could not feasibly achieve a 44.9% small business participation rate and/or (2) Polaris did not intend to achieve a  44.9% small business participation rate.

VIII.    COUNTS

**COUNT I**
**Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A)**

92.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

93.    In violation of 31 U.S.C. § 3729(a)(1)(A), Polaris knowingly presented or caused the presentment of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

94.    The false statements made by Polaris had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

95.     Polaris made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

96.     By virtue of the false or fraudulent claims that Polaris presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**
**False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B)**

97.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

98.      In violation of 31 U.S.C. § 3729(a)(1)(B), Polaris knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to  (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

99.     The false records and statements made by Polaris had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

100.    By virtue of the false records and statements made by Polaris, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**PRAYER FOR RELIEF**

WHEREFORE, Relators, on behalf of the United States, demand that judgment be entered in their favor and against Polaris for:

(1) Three times the amount of damages to the United States;

15

(2) Civil penalties of (1) no more than $11,000 and no less than $5,500 for each violation of the FCA that occurred after September 29, 1999 but before November 2, 2015 and (2) no more than $21,916 and no less than $10,957 for each violation of the FCA that occurred on or after November 2, 2015;

(3) Any other recoveries or relief provided for under the FCA;

(4) Relators' receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs, based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action; and

(5) Such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: September 20, 2017

**BERGER & MONTAGUE, P.C.**

/s/

E. Michelle Drake (MN Bar. No. 0387366)
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470

Daniel R. Miller (*pro hac vice* forthcoming)
1622 Locust Street
Philadelphia, PA  19103-6305
Telephone: (215) 875-3000
Facsimile: (215) 875-4604